## GENERAL COURT, MAY TERM, 1801.

### HALL's Lessee *vs.* GOUGH.

EJECTMENT for a tract of land called *Reprisal,* lying in Baltimore county. Defence on warrant, and plots returned.

1. The plaintiff at the trial, to make title to the land in the declaration mentioned, offered in evidence to the jury a patent for the said land, granted to the lessor of the plaintiff, on the 17th of November 1798, in virtue of a certificate of survey returned under a warrant of proclamation.

The defendant then produced and read in evidence to the jury, the certificate of a tract of land called *Thompson's Choice,* surveyed for *James Thompson* on the 12th of March 1679, which is the same land mentioned in the said patent to the lessor of the plaintiff; and in order to prove that the whole of the said land called *Thompson's Choice,* was conveyed by *James Thompson,* for whom the said certificate was made,

*In the margin:* MAY 1801 / Howard *vs.* Cromwell.

*In the margin:* Deeds for different parts of a whole tract of land located on the plots, may be read in evidence, though such deeds are not themselves severally located. The jury may presume a grant regularly issued where there had been a certificate of survey returned, and sundry conveyances and possession by persons claiming thereunder. The register of the land office examined as a witness as to the loss of records of his office, and as to certain practices which prevailed therein previous to the revolution.

and by *Arthur Thompson*, the heir at law of the said; *James Thompson*, produced and offered to read in evidence to the jury two deeds, the one from the said *James Thompson* to *Gabriel Parrott*, for 200 acres part of the said tract of land, dated the 4th of January 1693, and the other from the said *Arthur Thompson* to *Joseph Wilson*, for the residue of the said tract of land, dated the 25th of August 1702. The defendant also produced and offered to read in evidence to the jury, sundry deeds, which are hereafter more particularly described, from the said *Parrott* and *Wilson*, above mentioned, down to the present holders of the said land, for the whole of the said tract of land called *Thompson's Choice*.

To the reading of which two deeds the plaintiff objected, because the said deeds are not located on the plots returned in this cause.

DUVALL, J.*(a)* The Court are of opinion, that the said deeds are admissible in evidence to prove that the whole of the tract of land called *Thompson's Choice* is covered and conveyed by the said deeds, although not located on the plots returned in this cause. The plaintiff excepted.

The jury may presume a grant regularly issued where there had been a certificate of survey returned, and sundry conveyances and possession by persons claiming thereunder.

2. The plaintiff, to make title to the land in the declaration of ejectment mentioned, produced and read in evidence to the jury, a patent to the lessor of the plaintiff for the land in the declaration mentioned, dated the 17th of November 1798, reciting, "that whereas *Aquila Hall*, esquire, of Baltimore county, on the 11th day of May 1797, obtained out of the land office for the western shore, a special warrant of proclamation, to resurvey and affect a tract of land called *Thompson's Choice*, lying in the county aforesaid, originally on the 12th of March 1679, resurveyed for *James Thompson*, by virtue of the following warrants, to wit: a warrant for 550 acres, and a warrant for 250 acres, as appears by the certificate of the said survey, containing 1000 acres, which said certificate had not been compounded on as the law requir-

*(a)* Done, J. concurring. *Chase*, Ch. J. did not attend.

ed: In pursuance whereof a resurvey was made for and in the name of the said *Aquila Hall,* esquire, and a certificate thereof returned to the said land office, containing 964 acres, called *Reprisal;* and he having, pursuant to law, paid to the treasurer of the western shore the sum of 264*l* 7*s* 6*d,* being the full composition due for the said land and improvements thereon, The State of Maryland doth hereby grant unto the said *Aquila Hall* the said tract of land called *Reprisal,* lying in Baltimore county aforesaid, beginning," &c. "and containing and now laid out for 964 acres more or less, according to the certificates of resurvey taken and returned to the land office, bearing date the 28th of April 1798," &c.

The defendant, in order to prove that the said land mentioned in the patent to the lessor of the plaintiff by the name of *Thompson's Choice* had been before, to wit, in the year 1679, patented to one *James Thompson,* and therefore not liable to be proclamated, produced and read in evidence to the jury the certificate for the tract of land called *Thompson's Choice,* dated the 12th of March 1679, which is for the same land mentioned by the name of *Thompson's Choice,* in the patent under which the plaintiff makes title, and the same land located upon the plots in this cause returned, by that name; and which said certificate is as follows, to wit:

"*James Thompson's* Cert. 1000 acres, } March 12, *Thompson's Choice.* Rent. 2*l.* sterl. } 1679. By virtue of a warrant granted unto *James Thompson,* of Calvert county, gentleman, for 550 acres of land, bearing date the 14th of January last, and by virtue of a warrant granted unto the said *Thompson* for 250 acres of land, bearing date the 24th of January last, These are therefore, in humble manner to certify, that I, *George Holland,* deputy surveyor under *Vincent Lowe,* esquire, surveyor general, have laid out for the said *Thompson* a parcel of land called *Thompson's Choice,* lying in Baltimore county, on the ridge of Gunpowder river, beginning at a bounded oak, being the westermost bounds of a tract of land late laid out for Major *Sewell,* and running W. 500 perches, to a

bounded oak standing by the great falls, and running N. from the said oak 320 perches, then E. 500 perches, then with a straight line to the first bounded tree, containing and now laid out for 1000 acres of land, more or less," &c.   The defendant then produced and read in evidence to the jury, a deed from *James Thompson* aforesaid, to *Gabriel Parrott*, dated the 4th of January 1693, for "all that parcel or tract of land, being part of a tract of land called by the name of *Thompson's Choice*, lying and being upon the Great Falls of Gunpowder river, beginning," &c. containing 200 acres more or less; also a deed from *Arthur Thompson* to *Joseph Wilson*, dated the 25th of August 1702, for "all that piece or parcel of land situate, lying and being in Baltimore county, on the ridge of Gunpowder river, called or known by the name of *Thompson's Choice*, beginning," &c. "and formerly laid out for 1000 acres, be the same more or less, together with," &c. "all which said premises were heretofore the estate and inheritance of *James Thompson*, late of Calvert county, gentleman, deceased, brother of the said *Arthur*; and the reversion," &c. "except, and out of this present grant always saved and forever reserved unto *Gabriel Parrott*, of Anne-Arundel county, merchant, 200 acres of land, part of the said 1000 acres, heretofore sold him by the said *James Thompson*, deceased, beginning," &c. The defendant also produced and read to the jury, an entry in the oldest proprietary rent rolls to be found in the land office, in the following words and figures, to wit: "1000 acres, *Thompson's Choice*, surveyed 12th March 1679, for *James Thompson*, on the ridge of Gunpowder river, at the western bounds of the land of Major *Sewell*.

"800 acres, part in possession of *Arthur Thompson*.

"200 acres, residue possessed p. *George Parker*, Calvert county."

The defendant also produced and read to the jury, a deed from *Joseph Wilson* to *Benjamin Berry*, dated the 18th of October 1706, for the same land as conveyed to the said *Wilson* by *Arthur Thompson*; also a

deed from *Benjamin Berry* to *Richard Snowden*, dated the 7th of October 1737, for the same land as conveyed by *Wilson* to the said *Berry*; also a deed from *Richard Snowden* to *John Baldwin*, dated the 20th of October 1741, for 200 acres of the land conveyed by *Berry* to the said *Snowden*; also a deed from *Richard Snowden* to *Thomas Gittings*, dated the 16th of April 1742, for 600 acres, being the remainder of the land conveyed by *Berry* to the said *Snowden*; also a deed from *John Baldwin* to *Stephen Onion*, dated the 11th of June 1747, for 200 acres, being the land conveyed to the said *Baldwin* by the said *Snowden*; also a deed from *Gabriel Parker* to *Edward Reynolds*, dated the 17th of December 1722, for the same land as described in the deed from *James Thompson* to *Gabriel Parrott*; also a deed from *Thomas Reynolds* to *Thomas Gittings*, dated the 25th of December 1749, for the last above mentioned land. The defendant also produced and read to the jury, an entry in the proprietary old rent rolls, in the words and figures following, to wit: "1000 acres, *Thompson's Choice*, surv. 12 March 1679, for *James Thompson*, on the ridge of Gunpowder river, at the western bounds of the land of Major *Sewell*,

"800 acres, part in poss. of *Arthur Thompson*.

"200 acres, the residue, possessed p. *George Parker*, Cal. county."

[*Alienations.*]

"800 *Benjamin Berry* from *Joseph Wilson*, 18 October 1706.

"200 *Edward Reynolds* from *Gabriel Parker*, 17 December 1722.

"800 *Richard Snowden* from *Benjamin Berry*, 4 October 1737.

"200 *Thomas Gittings* from *Thomas Reynolds*, 21 Decr. 1749."

Also an entry in the proprietary late rent rolls, in the following words and figures to wit: "1000 acres *Thompson's Choice*, surveyed 12 March 1679, for *James Thompson* on the ridge of Gunpowder river.

MAY 1801

Hall
vs.
Gough

   " Poss. 200 . 0  8 0 *Stephen Onion*

   "    " 800 . 1 12 0 *Thomas Gittings.*

                  [*Alienation.*]

4. *Thomas Lucas* from *Thomas Gittings* 28 July 1769."

The defendant also produced and read to the jury, the will of *Stephen Onion,* above named, dated the 24th of August 1754, whereby he devised his real estate to his nephew *Zacheus Barrett,* in tail, upon his taking upon himself the name of *Onion,* which he did(*a*). The defendant also produced and read to the jury, a deed from *Stephen Onion,* eldest son and heir in tail of the said *Zacheus Onion,* to *Thomas Bond Onion,* dated the 12th of January 1790, for 200 acres, as described in the deed from *Baldwin* to *Onion* before mentioned; also a deed from *Thomas Bond Onion* to *Harry Dorsey Gough,* the defendant, dated the 24th of February 1790, for the last above mentioned land; also the will of *Thomas Gittings,* dated the 3d of November 1758, whereby he devised his part of the said tract of land called *Thompson's Choice,* to his son *Thomas Gittings;* also the will of *Thomas Gittings,* son of the above named testator, dated the 8th of July 1783, whereby he devised that part of the land called *Thompson's Choice,* held and claimed by him, to his sons the present holders of the same. The defendant also offered evidence to the jury to prove, that the pieces or parcels of land mentioned in and devised by the will of the said *Thomas Gittings* the younger, to his sons, are within the lines of the land called *Thompson's Choice* aforesaid, as located by the defendant upon the plots in this cause returned. The defendant then offered in evidence to the jury the testimony of five living witnesses, who deposed that they have known the land located on the plots by the defendant as *Thompson's Choice* for a period of forty-eight years and upwards next last passed; that during all that time it was generally deemed, reputed and considered, as *Thompson's Choice;* that during the whole of that time, the whole of the said land was generally

(*a*) See act of March 1762, ch. 21, to change the name of *Zacheus Barrett.*

deemed, reputed and considered, as the property of
the aforesaid *Thomas Gittings*, the elder, and the afore-
said *Stephen Onion*, the elder, and those respectively
claiming under them; that during the whole of the
period aforesaid, the said *Thomas Gittings*, the elder,
and those claiming under him, lived upon the said
land, and cultivated a part thereof; and that as far
back as they can remember, he *Thomas Gittings*, the
elder, was so living upon and cultivating the same;
and that from the first of their recollection, his said
dwelling and cultivation had the appearance of having
been many years settled; and that during the whole
of the time aforesaid the said *Stephen Onion*, the elder,
and those claiming under him, also held and cultivat-
ed a part of the said land. The defendant also swore
two other witnesses, who deposed that they had known
the said *Thomas Gittings* to reside on and cultivate
lands on the said *Thompson's Choice* upwards of fifty
years ago; and that at that time the place on which
he lived appeared to have been some years settled;
that the said *Thomas Gittings*, the elder, and those
claiming under him, have held and occupied the same
ever since, and still do hold and occupy the same;
that they have known settlements and occupations up-
on that part of the land called *Thompson's Choice*, for-
merly held by *Stephen Onion*, the elder, for the same
length of time; and that the same have ever since
been held by the said *Stephen Onion*, and those claim-
ing under him, and still are so held. The defendant
then produced and read in evidence to the jury, the
*debt books* of the Lord Proprietor of the Province of
Maryland, wherein are charged against the holders
of land, in the then Province of Maryland, the rents
due to the said Proprietor for the lands by them res-
pectively held, (the oldest of which rent books now
to be found goes no further back than the year 1754,)
and by the said rent books, shewed to the jury, that
*Thomas Gittings*, the elder, in the year 1754, stood
charged to the Lord Proprietor for the rent of 300
acres of land, part of *Thompson's Choice*; and that he
the said *Thomas Gittings*, the elder, and his son *The-*

*mas Gittings,* the younger, continued to stand so charged until the revolution; and that the said *Stephen Onion,* the elder, in the year 1754, stood charged in like manner with the rent of 200 acres, part of *Thompson's Choice;* and that he the said *Stephen Onion,* and those claiming under him, continued to stand so charged until the revolution. The defendant then produced *John Callahan,* Esquire, the register of the land office, who being duly sworn deposed, that the certificate for *Thompson's Choice* is recorded among the land records in his office, but that he has never seen, or been able to find the original certificate; that previous to the year 1700, the register of the land office did not record (as it appears by the old record books in his office,) the payment made by the party of the composition money for lands surveyed for such party, or make any marginal note in the record of the certificate of such payment, whether the said certificate was made upon a warrant of resurvey, or whether the said certificate, when returned, included more land than was expressed upon the warrant or warrants upon which the same was made. That in the year 1679, and before and after as far down as the year 1700, there are many certificates for lands surveyed for different persons, recorded in the land office, upon which it cannot be found that there is or are any patent or patents recorded in the said office; that this certificate for the said land called *Thompson's Choice* is in that situation. That it *is,* and always has been customary, to recite in the patent or grant, when issued, the consideration upon which the same issued, and the manner in which the composition money for the land mentioned in such grant was paid. That since the revolution, several old patents, granted between the years 1678 and 1700, and one as far back as the year 1682, which were in the hands of those holding under the patentees therein named, and which had never before been recorded in the land office, have been produced to him to be recorded, and have been recorded. That it has sometimes happened to himself, since he has been in office, that the per-

*The register of the land office examined as a witness as to the loss of records of his office, and as to certain practices which prevailed therein previous to the revolution.*

son for whom a patent was made out, took it to the governor to procure his signature, and having obtained it, never returned the patent to him to be recorded, whereby it happened that a patent in such case did regularly issue, and yet there was and is no record of it in his office. That for near thirty years last passed, he has from time to time frequently heard a report, that one of the old record books in the Proprietary Land Office, containing the record of patents, has been lost. That the record books in the land office refer from one to the other, and that he never found a reference to any record book, which is not to be found in the office; and that he, Mr. *Callahan,* from thence is of opinion, no record book has been lost out of the said office, burnt or destroyed.

The defendant then prayed the opinion of the court, and their direction to the jury, that from the evidence produced in this cause, if they believe it, they may and ought to presume, that a patent regularly issued from the Lord Proprietor of Maryland to the above named *James Thompson,* for the said land called *Thompson's Choice.*

Duvall, J.(a). The court are of opinion, and so direct the jury, that under all the circumstances of this case, if they find the facts above stated to be true, they may and ought to presume that a patent regularly issued to *James Thompson* for the tract of land called *Thompson's Choice.* The plaintiff excepted.

*Harper* and *Johnson,* for the plaintiff.
*Martin,* (Attorney General,) *Mason* and *Scott,* for the defendant.

Verdict and judgment for the defendant. The plaintiff appealed to the Court of Appeals, where the judgment of the General Court was *affirmed,* at November term 1803, the opinions expressed in both of the *bills of exceptions* having been concurred in.

(a) *Done,* J. concurring. *Chase,* Ch. J. owing to indisposition did not attend.